# In the United States Court of Federal Claims

No. 10-51C
(Filed: June 17, 2014)

* * * * * * * * * * * * * * * * * * * *

NORMANDY APARTMENTS, LTD.,

                    *Plaintiff*,

v.

THE UNITED STATES,

                    *Defendant.*

Regulatory Taking; Fifth
Amendment; Housing
Assistance Payments;
Public Housing Authority

* * * * * * * * * * * * * * * * * * * *

    *Walter W. Mills*, Oklahoma City, OK, for plaintiff.

    *Amanda L. Tantum*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Stuart F. Delery*, Assistant Attorney General, and *Robert E. Kirshman, Jr.*, Director, for defendant. *Patricia S. Flagg*, Senior Trial Attorney, U.S. Department of Housing and Urban Development, Washington, DC, of counsel.

## OPINION

    Plaintiff, Normandy Apartments, Ltd. ("Normandy") brought this action initially as a breach of contract claim. Normandy owns and manages an apartment building in Tulsa, Oklahoma, for which it received housing assistance payments from The Department of Housing and Urban Development ("HUD") in exchange for maintaining the building for low income tenants at reduced rental rates. It asserted that HUD violated that contract by refusing to continue to make those housing assistance payments. In an earlier decision, the court granted the government's motion to dismiss, concluding that Normandy and the United States were not in privity of contract.[1] *Normandy Apartments, Ltd. v. United States*, 100 Fed. Cl. 247

---

[1]After the case was transferred to the undersigned the court asked for
(continued...)

(2011).  The court allowed plaintiff to amend its complaint, however, to state a claim for a taking of real property in violation of the Fifth Amendment. Defendant has moved for summary judgment on that sole remaining claim.[2] For the reasons explained below, we grant the motion for summary judgment.

BACKGROUND

I.  Factual Background[3]

Normandy is a limited partnership operating out of Oklahoma City, Oklahoma.  Normandy owns and manages an apartment complex in Tulsa, Oklahoma, which was built in 1968.  Most of the apartments are purposed for government-assisted affordable housing, commonly known as "section 8 housing."[4]  The construction of the apartments was originally funded, at least in part, by a mortgage insured by the Federal Housing Authority, a part of HUD .  In exchange for the HUD-backed loan, Normandy entered a regulatory agreement with HUD whereby it agreed to reserve a large number of units for

───────────────

[1](...continued)
additional briefing on the issue of whether there was privity of contract.  As we explain below, we believe the initial decision was correct.

[2] As is explained more fully below, defendant initially moved to dismiss pursuant to rules 12(b) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").  Pursuant to rule 12(d), we converted the portion of the motion under rule 12(b)(6) to one for summary judgment under rule 56. *Normandy Apartments, Ltd. v. United States*, No. 10-51C (Fed. Cl. Fed. Cl. July 18, 2013) (order converting motion).

[3] These facts are drawn from the amended complaint and from the parties' submissions in support or opposition to the motion for summary judgment. These facts are largely not in dispute, and those that are, are not material to our holding.  A more complete recitation of the background is set out in *Normandy Apartments, Ltd. v. United States*, 100 Fed. Cl. 247 (2011).

[4] "Section 8" refers to section 8 of the Housing Act of 1937, amended in 1974 to create the housing assistance program known as "Section 8."  *See generally* 42 U.S.C. § 1437f (2012)

low income tenants.  Def.'s App'x 1-8 (1967 Regulatory Agreement).[5]

In 1992, Normandy also entered into a Housing Assistance Payments ("HAP") contract with HUD.  It agreed to maintain and operate 192 of the units for low income families in a "decent, safe, and sanitary" manner in exchange for monthly rental assistance payments from HUD.  *See* 24 C.F.R. § 886.323(a) (2013).  Under the HAP contract, HUD agreed that, "[f]or each contract unit occupied by an eligible family in accordance with this Contract, HUD will pay the Owner the difference between the HUD-approved gross rent and Gross Family Contribution required by HUD regulation[]."  Def.'s App. 20 (1992 HAP contract).  The contract also provided that "[e]ligibility for, and the amount of, any housing assistance payments will be determined in accordance with HUD's regulations and administrative procedures."  *Id*.  In exchange, Normandy agreed to "maintain and operate the contract units and related facilities so as to provide decent, safe, and sanitary housing as defined by HUD," to clean and "make repairs with reasonable promptness," to "respond promptly to HUD's Physical Inspection Reports and to implement corrective actions within a reasonable time."  *Id*. at 21.

HUD could consider Normandy in default if it "failed to comply with any provision or obligation [under the HAP] Contract."  *Id.* at 25.  In the event of a default, HUD would notify Normandy by certified mail and provide Normandy with a length of time during which it could correct the default.  *Id.* HUD also reserved the right to withhold, suspend, or reduce housing assistance payments until Normandy had cured the default to HUD's satisfaction.  *Id.*  Finally, the contract restricted Normandy's right to freely assign or alienate the property by providing that "HUD will approve a change of ownership during the term of this Contract only if the purchaser demonstrates, to HUD's satisfaction, an ability to administer this Contract and agrees to carry out all terms of this Contract."  *Id.* at 26.  After an initial five-year term, the HAP contract was renewed annually until 2004.  On October 1, 2004, Normandy signed a HAP Basic Renewal Contract, but the contract administrator for this contract was the Oklahoma Housing Finance Agency ("OHFA") and not HUD.  OHFA signed the contract.  No one from HUD did.

---

[5] "Def.'s App." refers to the appendix of materials submitted by defendant in response to our order of July 18, 2013, which converted portions of defendant's motion to dismiss to a motion for summary judgment.

Although all of the terms of the original HAP contract were renewed,[6] HUD was not a party to the this contract. *See Normandy*, 100 Fed. Cl. at 254-58.

Normandy also entered into an "Use Agreement" with HUD on May 23, 2000. This agreement allowed Normandy to prepay its HUD-backed mortgage and terminate the 1967 Regulatory Agreement between it and HUD. Pursuant to the Use Agreement, HUD gave its consent for Normandy to prepay its HUD-insured mortgage, and, in exchange, Normandy agreed to continue housing low income families until June 1, 2009, which was the original maturity date of the mortgage. The Use Agreement provides the following:

> Upon the prepayment, in full, of the Secured Note and the Promissory Note, . . . all provisions of the Use Agreement shall immediately become applicable to the Residential Area, and all restrictions and obligation shall thereafter be binding upon the Residential Area and the Owner of the Housing Project, or any successors in interest, until the Maturity Date of this Use Agreement.

Def.'s App. 13. Through this agreement, Normandy's use of the apartment complex was restricted to "rental housing for tenants of lower income" and Normandy agreed not to evict existing tenants based on income. *Id.* The Use Agreement also established caps on, methods for calculating, and procedures for increasing the amount of rent that Normandy could charge the tenants.

---

[6] The 2004 HAP renewal contract expressly provided the following:

> Housing assistance payments shall only be paid to the Owner for contract units occupied by eligible families leasing decent, safe, and sanitary units from the Owner in accordance with statutory requirements, and with all HUD regulations and other requirements. If the Contract Administrator determined that the Owner has failed to maintain one or more of the contract units in decent, safe and sanitary condition, and has abated housing assistance payments to the Owner for such units, the Contract Administrator may use amounts otherwise payable to the Owner pursuant to the Renewal Contract for the purposed [sic] of relocating or rehousing assisted residents in other housing.

Def.'s App. 37.

The Use Agreement is independent of the HAP contract, although the former contemplates the possibility that a HAP contract may cover some or all of the units. *Id.* at 14 (Use Agreement). Like the HAP contract, the Use Agreement required Normandy to maintain the apartment complex "in a condition that is decent, safe, sanitary, and in good repair, as well as in compliance with all applicable state and local building and health codes." *Id.* at 16. Normandy was also obligated to certify annually that the apartment complex is in compliance with "all applicable codes or that a remedial program to correct any existing deficiencies has been implemented." *Id.* at 17. Lastly, Normandy agreed to obtain the written approval of the Secretary of HUD before conveying the property. *Id.* at 16. According to the Use Agreement, any successor in interest would likewise be bound by the terms of the agreement. *Id.* at 10-11.

In November 2004, HUD's Real Estate Assessment Center ("REAC") inspected the apartments to verify that the units were safe, decent, and sanitary. The apartments received a failing score. Normandy promptly corrected the identified deficiencies. OHFA conducted an inspection in February of 2005 and noted that the problematic conditions had been fixed. HUD did not reinspect the apartments but notified Normandy in February of 2006 that it was closing the November 2004 inspection and review of the property.

By regulation, HUD is required to inspect the project annually, with inspections occurring between nine and fifteen months from the last inspection. 24 C.F.R. §§ 200.855(c)(1), 886.323 (2013). However, the next HUD REAC inspection did not occur until over 20 months later, on August 23, 2006. Normandy failed this inspection. Plaintiff claims that it failed this inspection because the apartment complex was undergoing repairs; specifically, all of the windows were being replaced. Normandy requested that HUD adjust the score to reflect the ongoing improvements. On October 15, 2006, Normandy called HUD to inquire about the status of its appeal regarding the score. HUD responded in mid-November that Normandy had missed the deadline to appeal the score.

Near the end of March 2007, HUD requested that Normandy write a letter stating that it was in compliance with the inspection requirements. Normandy was not able to certify its compliance, however, because the window replacements were ongoing. Instead, Normandy furnished a letter from its window contractor, which provided the anticipated completion date for repairs. HUD assured Normandy that it would be granted a reinspection. Rather than reinspect, however, HUD sent a letter to Normandy on June 20,

2007, stating that HUD would cease to fund housing assistance payments because plaintiff had defaulted on the HAP contract by repeatedly failing to maintain the apartments.  Normandy asserts that HUD did not provide the appropriate notice because Normandy was not given an opportunity to cure the default by making repairs.[7]

Normandy alleges that it made repairs and continued trying to obtain a reinspection, but HUD remained steadfast.  On September 28, 2007, HUD advised Normandy through correspondence to stop accepting new tenants who qualified for low income assistance programs because HUD would be terminating its assistance payments.  HUD notified Normandy's tenants that

---

[7] The original HAP contract provides the following:

> Upon determining that a default has occurred, HUD will notify the Owner, by certified mail of the nature of the default, the actions the Owner must take to cure the default, and the time within which the Owner must complete the corrective actions. If the Owner does not implement the requested actions, or other corrective action acceptable to HUD, within the prescribed time or does not do so to the satisfaction of HUD, HUD may terminate this Contract in whole or in part or may initiate any of the following actions. . . . Reduce or suspend housing assistance payments until the default under this Contract has been cured to the satisfaction of HUD.

Def.'s App. 25.  The contract language mirrors the following regulatory requirement:

> The contract shall contain a provision to the effect that if HUD determines that the owner is in default under the contract, HUD shall notify the owner of the actions required to be taken to cure the default and of the remedies to be applied by HUD including recovery of overpayments, where appropriate, and that if the owner fails to cure the default within a reasonable time as determined by HUD, HUD has the right to terminate the contract or to take other corrective action, including recission of the sale.

24 C.F.R. § 886.320; *see* 24 C.F.R. § 886.120.

the assistance payments made by HUD to Normandy on behalf of those low income tenants would stop on November 1, 2007. HUD explained that affected tenants could apply for vouchers that could be used either to offset their rent at the Normandy apartments or enable them to move elsewhere. Shortly before HUD abated the housing assistance payments on November 1, 2007, HUD informed Normandy that it remained obligated to continue honoring the below market rental rates during the existing lease terms. Def.'s App. 96 (September 28, 2007 letter from HUD to Normandy).

Before HUD ceased providing assistance payments, Normandy attempted to sell the apartment complex. According to plaintiff, on October 16, 2007, Summit Assets Management, L.L.C. ("Summit") agreed to purchase Normandy apartments for $8 million. Plaintiff sought HUD's approval of the sale, pursuant to paragraph seven of the Use Agreement, Def.'s App. 16, but according to plaintiff, HUD withheld its approval of the property transfer, and therefore, Summit was unable to purchase the apartments. Normandy claims a loss of approximately $2.75 million because the apartments subsequently decreased in value and, as of 2009, were appraised at $5.25 million.

II.    Procedural History

On October 18, 2007, plaintiff filed suit in the United States District Court for the Western District of Oklahoma, requesting, among other things, a preliminary injunction ordering that HUD would continue making housing assistance payments during the pendency of the litigation. *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.*, No. Civ-07-1161-R, 2007 WL 3232610, at *1 (W.D. Okla. Nov. 1, 2007). The court denied the preliminary injunction and held that plaintiff had not established the necessary irreparable harm to merit such relief. *Id.* at *3-4. The court also concluded that it lacked jurisdiction because plaintiff's claim was actually for the money due on the contract and therefore belonged in the United States Court of Federal Claims. *Id.* at *2-3. Plaintiff appealed to the Court of Appeals for the Tenth Circuit. *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 1290 (10th Cir. 2009). The Court of Appeals reversed in part and affirmed in part the district court's decision. *Id.* at 1300-01. It reasoned that, in so much as plaintiff alleged that HUD had violated regulation and sought equitable relief to preserve its ongoing contractual relationship with HUD, the district court possessed jurisdiction through the Administrative Procedure Act ("APA"). *Id.* at 1297-98. However, if plaintiff wished to obtain over $10,000 in money damages for breach of contract, then that claim was within the exclusive jurisdiction of the Court of Federal Claims. *Id.* at

1299-1300.  The Tenth Circuit thus held that plaintiff asserted two claims: one which it would dismiss for lack of subject matter jurisdiction and the other which it would remand for consideration in the district court.  *Id*. at 1299-1301.

Instead of pursuing its remaining APA claim in district court, plaintiff voluntarily dismissed that action and subsequently filed suit here on January 25, 2010.  Plaintiff's original complaint here asserted a breach of the HAP contract and requested approximately $3.5 million in damages.  Defendant moved to dismiss the case for lack of subject matter jurisdiction on the grounds that the United States was no longer a party to the HAP contract.  Judge Allegra agreed, finding that HUD was not in privity of contract with Normandy for purposes of the HAP renewal contract because OHFA had replaced HUD as administrator of and signatory to the contract in 2004.  100 Fed. Cl.  at 256-58.  Without a contract relationship between plaintiff and the United States, at least with respect to assistance payments, this court did not have jurisdiction over the breach of contract claim.  *Id.*  Although the court dismissed plaintiff's contract claim, it permitted plaintiff to amend its complaint to assert a regulatory takings theory.  *Id.* at 258-59.

In its amended complaint, plaintiff claims that HUD's actions amounted to a taking of Normandy's property interests without just compensation in violation the Fifth Amendment of the Constitution.  Specifically, Normandy alleges that HUD's actions interfered with plaintiff's property interests in the apartment complex, the Use Agreement, the HAP contract, and its purchase agreement with Summit.  Defendant, once again, filed a motion to dismiss pursuant to RCFC 12(b), arguing that plaintiff could not identify a property interest that was taken and that plaintiff had failed to state a takings claim upon which relief could be granted.  This case was transferred to the undersigned on January 7, 2013.  We heard oral argument on March 4, 2013.  Because plaintiff asserts a regulatory taking, we requested that the parties explain the regulatory scheme in supplemental briefs.[8]  The parties filed their responses on April 4,

---

[8] We posed the following questions:

1.   Which regulations apply when a low income housing owner/operator fails to maintain the housing units in a safe, decent and sanitary condition?  How did that regulatory scheme operate in this case?  Specifically, do the regulations provide for

(continued...)

2013.  We later converted defendant's motion for failure to state a claim to a motion for summary judgment pursuant to Rule 12(d) because it is necessary to rely on materials outside of the complaint and not incorporated by reference to resolve the motion.  We allowed the parties to supplement their briefs by filing additional factual materials.

Subsequent to that briefing, we contacted the parties and posed questions regarding the authority for HUD's actions in cancelling the payments to plaintiff and whether HUD might still be a party to the HAP Renewal Contract.  We ordered the parties to file supplemental briefs regarding certain indications in the record that suggested that HUD might be a party to the HAP Renewal Contract despite the fact that OHFA was the contract administrator.  *See Normandy Apartments, Ltd. v. United States*, No. 10-51C (Fed. Cl. Feb. 14, 2014) (order requesting supplemental briefing).  A supplemental oral argument was held on May 22, 2014.  For the reasons set out below, we reaffirm our earlier ruling that plaintiff was not in privity of contract with the United States under the HAP renewal contract and thus cannot maintain a claim for breach of contract.  In addition, because plaintiff bargained away the rights it claims were taken or voluntarily relinquished them, it cannot assert a takings claim with respect to those rights. We therefore grant defendant's motion for summary judgment.

## DISCUSSION

Plaintiff's amended complaint is based on the Fifth Amendment's

---

[8](...continued)
  alternative forms of compensation when HUD abates housing assistance payments?

  2.  What regulations or contract provisions applied to a proposed sale of the Normandy apartment complex, which in 2007 was operated pursuant to HUD's low income housing program?  Was there application for and approval or denial of a sale of the Normandy apartment complex?  If there had been an application to HUD requesting permission to sell the property, on what grounds could HUD have denied the transfer?

*Normandy Apartments, Ltd. v. United States*, No. 10-51C (Fed Cl. Mar. 5, 2013) (order requesting supplement briefing).

prohibition, "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V, cl. 4. Defendant's motion challenging the amended complaint centers on the existence of two contracts entered into by plaintiff concerning the rights it claims taken. Defendant draws two conclusions from the existence of these agreements. The first is that plaintiff can not establish a property interest, which is required for standing in a takings claim, because it has bargained away that interest. The second is that plaintiff cannot establish the necessary elements of a regulatory takings claim.

I. Plaintiff Has Standing

Defendant asserts that plaintiff has not identified a property interest on which to build its takings claim. At a minimum, plaintiff must show that it has standing by establishing a concrete and actual injury to a legally protected interest, a causal connection between the harm and the defendant's action, and a likelihood that the injury may be redressed. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In order to establish the first requirement of standing for a takings claim—an injury to a legally protect interest—plaintiff must point to "a property interest for purposes of the Fifth Amendment." *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004) (citing *Maritrans Inc. v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003)). Only "'persons with a valid property interest at the time of the taking are entitled to compensation.'" *Id.* (quoting *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001)). If plaintiff does not own the requisite property interest it claims was taken, it does not have standing, and therefore the court would lack jurisdiction.

Defendant identifies two lines of cases to support its position. In the first, the court dismissed for lack of standing because plaintiff did not own the property at the time of the taking. In *CRV Enterprises, Inc. v. United States*, the Federal Circuit held that the plaintiff must own the property rights at the time of the alleged taking, which accrues "when 'the government entity charged with implementing the regulation has reached a final decision regarding the application of the regulations to the property at issue.'" 626 F.3d 1241, 1249 (Fed. Cir. 2010) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2000)).

The second line of cases is *American Pelagic* and its predecessors *Conti v. United States*, 291 F.3d 1334 (Fed. Cir. 2002) and *Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed. Cir. 1993). In each of these cases, the Court of Appeals for the Federal Circuit dismissed the takings claim because the

plaintiff failed to establish a property interest that was cognizable under the Fifth Amendment.   However, in these cases, plaintiff's property was a government-issued license, personal property, or a combination of the two. The Federal Circuit characterized these cases in the following manner:

> What allegedly was taken in *Mitchell Arms* was the right to import firearms and sell them in domestic commerce.   What allegedly was taken in *Conti* was the right to harvest swordfish in the Atlantic Swordfish fishery using drift gillnets.   In each case, the takings claim failed because what allegedly was taken was not one of the sticks in the bundle of rights that inhered in ownership of the underlying *res*: in *Mitchell Arms*, certain firearms; in *Conti*, a fishing vessel.

*American Pelagic*, 379 F.3d at 1382.   The court of appeals concluded in *American Pelagic* that government action in the form of regulation, even though it deprived plaintiff of the viable use of its ship, did not constitute a taking because boat ownership did not include a unregulated right to use the boat to fish in whatever manner the owner wished.   *Id.* at 1382-83.

In contrast, Normandy here asserts that its takings claim is built upon the fee ownership of the Normandy apartments.   The Federal Circuit recognizes that the fee ownership of real property gives rise to a greater bundle of rights than ownership of personal property, which includes the right to sell or rent even when that real property is subject to HUD regulations or restrictions based in contract. *Cienega Gardens v. United States*, 331 F.3d 1319, 1329, 35-36 (Fed. Cir. 2003).   Thus, for purposes of the takings claim that arises from plaintiff's fee ownership of the Normandy apartment complex, which includes such property interests as the right to exclude and the right to collect rents, plaintiff has standing.   Additionally, contract rights may be the subject of a takings claim.   *Id.* at 1329-30.   In so much as plaintiff alleges that HUD took its contract with Summit for the sale of the complex by withholding approval, plaintiff has standing to pursue that claim.   We conclude that plaintiff has standing to assert its takings theories, and we therefore have jurisdiction.

II.  Plaintiff Can Not Prevail On Its Takings Claim

Plaintiff's complaint and subsequent filings center on HUD's safety inspections, Normandy's efforts to correct deficiencies, and HUD's subsequent cancellation of direct payments to Normandy.   It is difficult to read plaintiff's

11

papers without concluding that it believes HUD's cancellation of direct payments to Normandy was legally improper.    Plaintiff is thus in an uncomfortable position: "[A]n uncompensated taking and an unlawful government action constitute 'two separate wrongs [that] give rise to two separate causes of action,' and that a property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated taking in the Court of Federal Claims."  *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1365 (Fed. Cir. 2001) (quoting *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1364 (Fed. Cir. 1998)).  The tortured procedural history in this case demonstrates the jurisdictional tension between the district court, which possessed jurisdiction pursuant to the APA to hear the administrative claim and provide equitable relief,[9] and this court, which has jurisdiction under the Tucker Act to adjudicate a takings claim and provide a monetary award.

Plaintiff is not required to litigate its administrative claim before pursing a takings claim in this court.  *Id*.  However, there are restrictions on the scope of plaintiff's claim if he chooses to sue here instead of pursuing an APA claim.  "[I]f the plaintiff claims that its property was taken *regardless of* whether the agency acted consistently with its statutory and regulatory mandate," then "the takings claim can be litigated in the Court of Federal Claims." *Id*. at 1365, 1366.  "On the other hand, to the extent that the plaintiff claims it is entitled to prevail *because* the agency acted in violation of statute or regulation," plaintiff does not have the "right to litigate that issue in a takings action rather than in the congressionally mandated administrative review proceeding." *Id.* at 1366.  Thus, in order to pursue a takings claim in this court without first litigating the administrative issue, plaintiff must proceed on the "assumption that the administrative action was both authorized and lawful." *Id.*  Operating under that assumption, we turn to plaintiff's takings claim.

In its amended complaint, plaintiff summarizes its claim: "HUD, through its actions, interfered with Normandy's property interests in the property, Normandy Apartments, the Use Agreement, its HAP contract with

---

[9] Under *Bowen v. Massachusetts*, equitable relief offered in the district court can have the practical effect of granting compensation.  487 U.S. 879 (1988) (holding that a district court had the authority to order the payment of money owed under a statute pursuant to its jurisdiction under the Administrative Procedure Act).

12

OHFA, and its purchase agreement with Summit Assets Management." Am. Compl. ¶ 45. Plaintiff expounds somewhat in its response to defendant's present motion by arguing that, under HUD regulations, it was required to "set aside almost all of its project's units for . . . [low income] tenants for reduced rents. That is, Normandy could not obtain full market rent for its property under the government regulation." Pl.'s Opp'n to Def.'s Mot. 7. When Normandy stopped receiving the HAP contract subsidy payments, "the government shifted the public burden of providing affordable housing to low-income tenants disproportionately to Normandy, effectively appropriating Normandy's private property for public use." *Id.* Normandy also alleges that defendant interfered with its ability to sell the property to Summit.

The classic test when considering a regulatory taking is found in the Supreme Court's *Penn Central* opinion, in which it supplied several relevant factors to consider when evaluating a regulatory taking:

> The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backs expectations are, of course, relevant considerations. . . . So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by the government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (internal citations omitted). The Court characterized the analysis of these factors as "essentially ad hoc, factual inquiries." *Id.* Here, plaintiff has not alleged that the nature of the interference with its property was so total that it was tantamount to a physical invasion. Rather, it believes that it has been prevented from making full use of the property by setting rents as it will and has been prevented from freely alienating the property due to HUD's failure to approve sale of the apartments to a third party.

Summary judgment is appropriate when the record indicates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Because our holding is not dependent upon any disputed facts, summary judgment is appropriate.

### 1. Defendant's Position

In its motion, defendant argues that Normandy cannot show an investment-backed expectation to sell the property to Summit because it knew that HUD had the contractual right to approve or disapprove of any sale of Normandy Apartments.  In addition, plaintiff had no reasonable expectation to continue receiving payments under the HAP contract when that contract expressly conditioned those payments on keeping the property in a condition that met HUD's approval.

Defendant also believes that the character of its actions does not support a regulatory taking claim.  The most basic reason is that plaintiff entered into a separate Use Agreement with HUD in which it both limited its right to freely set rents and its right to alienate the property.  When the government merely insists on contract performance, its actions do not give rise to a takings claim, which defendant argues is the case here.

Lastly, the government maintains that the economic impact to Normandy is insufficient to support a regulatory taking claim.  Defendant argues that the way in which to value a taking of property, whether by physical invasion or regulation, is by comparing the value of the property before the taking with the value of the property after the taking.  Defendant quotes *Yancey v. United States*, in which the Federal Circuit explained, "[f]air market value under the Fifth Amendment is normally ascertained at the date the governmental restrictions are imposed, which is the date of the taking."  915 F.2d 1534, 1543 (Fed. Cir. 1990).  Following from that principle, defendant argues that Normandy has not alleged a diminution in the market value of the property after HUD abated the subsidy or disapproved of the sale to Summit. What Normandy seeks instead are contract damages–reliance and lost profits–damages not cognizable under the Fifth Amendment Takings Clause.[10]

### 2. Plaintiff's Rights to Set Rents and Receive Subsidy Payments

---

[10] Defendant also raises two other arguments with regards to plaintiff's takings theory: that what Normandy complains of is not a direct taking of the HAP or Summit Purchase Agreements but rather frustration of purpose; and, with regard to the purchase agreement, what it complains of is government inaction, not action.  Neither of those complaints give rise to a takings claim, defendant argues.  We need not treat these concerns directly because they are subsumed by our resolution of defendant's other arguments.

The first property interest allegedly taken through the operation of HUD regulations, according to plaintiff, is its ability to obtain market rent at its Normandy Apartments complex. "Under HUD's regulations and applicable statutes, Normandy was required to set aside almost all of its project units for HUD-qualified (low income) tenants for reduced rents." Pl.'s Opp'n 7. Plaintiff sees its claim as analogous to that made in *Cienega Gardens*.[11] When HUD abated the direct subsidy to Normandy, "HUD retained part of the contract–that which required Normandy to house low-income tenants at below-market rents," which was a taking of plaintiff's contractual right to the subsidy and its right to set rents attendant to fee ownership of the property. *Id.* at 9 (citing *Cienega*, 331 F.3d at 1335). The government, in essence, kept in force the contractual duties owed to OHFA to provide low income housing, but abrogated the rest of the contract by canceling the direct subsidy payments.

In support of its theory, plaintiff cites the June 2007 and September 2007 letters from HUD to plaintiff informing plaintiff of the abatement of direct housing subsidies due to "failure to maintain [the] project in decent, safe, and sanitary condition." Def.'s App. 91, 96. Both letters informed Normandy that it was in breach of its HAP contract and that it had previously been warned that, if it did not correct its deficiencies, HUD would "seek any and all remedies provided in the HAP Contract." *Id.* The second letter stated that the subsidy payments for the project were suspended "pursuant to 24 CFR Part 886.323(a) . . . and paragraph 2.5(a) et seq., of the HAP Contract."[12] Def.'s App. 96. The letter goes on to quote the regulatory provision: "The owner shall maintain and operate the project so as to provide decent, safe, and sanitary housing." 24 C.F.R. § 886.323(a) (2007). The letter concludes by informing Normandy that it could not increase the "tenant's share of their rent during their lease term, or pending the relocation of those eligible Section 8 tenants to decent, safe, and sanitary housing." Def.'s App. 96.

_____

[11] In *Cienega*, the plaintiffs were owners of many low-income apartment complexes. They sued HUD, alleging that statutes preventing them from pre-paying their subsidized mortgages, and thus escaping the attendant regulatory restrictions, constituted a taking of their property. 331 F.3d at 1323.

[12] The reference to paragraph 2.5(a) appears to have been a clerical error. Section or paragraph 2 of the original HAP Contract is a general reference to the various sections of the contract appearing thereafter. *See* Def.'s App. 19. Section 2 of the renewal contract lists the term of the contract. *See* Def.'s App. 34.

The original HAP contract made it clear that, should Normandy fail to correct deficiencies in performance to the satisfaction of HUD, HUD could stop assistance payments. *See* Def.'s App. 21, 25 (1992 HAP Contract between Normandy and HUD). The 1997 renewal contract with OHFA incorporated those terms by reference. *See* Def.'s App. 37 (1997 HAP renewal contract between Normandy and OFHA) ("Except as specifically modified . . . , all provisions of the Expiring Contract are renewed"). The terms of the contract are clear. Payments to Normandy were contingent upon Normandy maintaining the property up to HUD's standards. To the extent that plaintiff had a property right in receiving payments, it was one arising out of the HAP contract. The relationship between plaintiff and the Section 8 housing program is a voluntary one created by contract.[13] In exchange for the subsidy payments, plaintiff agreed to set aside most or all of the units at its Normandy Apartments project for Section 8 low income tenants and to charge those tenants a reduced rate.

Plaintiff additionally agreed to set aside the Normandy project for low income housing in the 2000 Use Agreement. By the Use Agreement, HUD permitted Normandy to prepay its HUD-insured mortgage on the Normandy project in exchange for setting aside the project for low income housing until 2009. New tenants were required to have an income lower than a limit defined in the agreement, and the rent to be charged could not exceed a limit also defined by the agreement. *See* Def.'s App. 13-14. The agreement also contained provisions for raising rents, which listed the reasons for which rent could be raised and required the approval of HUD.[14] *Id.* at 14. The owner was required to maintain the property "in a condition that is decent, safe, sanitary, and in good repair, as well as in compliance with all applicable state and local building and health codes." *Id.* at 16. The Use Agreement was in effect until June 1, 2009. Plaintiff therefore was, completely independent of the HAP contract or any HUD regulations, obligated to preserve the Normandy project for low income tenants at reduced rents and could not raise rents without

---

[13] The Section 8 housing program is entirely voluntary. Project owners enter the program through agreements with HUD or state administrative agencies. They do so of their own accord and not otherwise required by federal law to set aside their properties for low income housing. Once they do so, however, they are subject to HUD regulation of low income housing.

[14] Apartments covered by a HAP contract were excepted from the Use Agreements limits on raising rents. *See* Def.'s App. 14.

HUD's approval.

The conclusion that inevitably follows is that HUD did not affect a taking when it ended HAP payments. Plaintiff's right to receive the housing assistance payments was controlled by the HAP renewal contract with OHFA. Those payments were conditioned, however, on performance to the satisfaction of a third party, HUD. Plaintiff may disagree with how HUD handled the administrative procedures involved in weighing the performance and the conclusion that HUD reached, but there is no question that the right to receive those payments was limited by contract, and, indirectly, by the regulatory regime incorporated into that contract. The result is that HUD was not "taking" a property interest when it exercised its regulatory role of monitoring the condition of the building. Plaintiff did not, by contract, have the right to those payments free of potential HUD oversight. It had contracted away that right. *See Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 655-56 (2003) (dismissing takings claim where rights asserted to have been taken were created by contract and thus enforceable through a contract action); *see generally Sun Oil Co. v. United States*, 215 Ct. Cl. 716, 770 (1978).

A similar conclusion follows as to plaintiff's allegation that the government took its right to freely set rents at the Normandy project. Plaintiff twice relinquished that right voluntarily in separate agreements with OHFA and HUD. Even if we assumed that the HAP contract was repudiated and no longer in force when HUD abated the subsidy payments,[15] plaintiff would still not have had the right to freely set the rents at the Normandy project because the Use Agreement between plaintiff and HUD was in force at the time of the alleged taking. A takings claim cannot succeed when the very rights claimed to have been taken by the government were subject to separate contractual limitations giving the government the right to control rents.

There is thus no material dispute as to the nature of the relationship between Normandy, HUD, and the rights alleged to have been taken. Plaintiff had neither an investment-backed expectation in the right to receive subsidy payments outside the limitations imposed by the HAP contract nor did it have such an expectation in the right to set rents after it voluntarily agreed to limit that right in exchange for the right to prepay its mortgage. The cancellation of the subsidy payments and insistence that plaintiff continue to provide low

---

[15] We note that plaintiff never made this argument explicitly. We only infer it from plaintiff's more general arguments.

income housing cannot constitute a regulatory taking because those actions were taken pursuant to valid contracts between plaintiff and HUD and plaintiff and OHFA. Whether HUD was entitled to abate those payments and, after it did so, whether Normandy was entitled to set rents as it would have liked to are questions of contract and/ or regulatory interpretation.   The Fifth Amendment is silent as to the resolution of those questions.

3.  Plaintiff's Right to Alienate the Property

Plaintiff also contends that HUD's refusal to authorize sale of the Normandy project to a third party, Summit, amounted to a taking of the building.  Defendant does not challenge the assertion that HUD had the right to veto any sale of the property.  The parties do disagree as to whether HUD actually exercised that right in this instance. Defendant points out that plaintiff has not provided any proof of sales agreement between Normandy and Summit other than a self-serving affidavit of one plaintiff's principles.   This disagreement does not foreclose summary judgment, however.

Normandy agreed to limit its right to alienate the property in exchange for participation in the direct subsidy program through the HAP Contract and for the right to prepay its mortgage in the Use Agreement.  The original HAP contract stated that HUD would "approve a change of ownership . . . only if the purchaser demonstrates, to HUD's satisfaction, an ability to administer this Contract and agrees to carry out all terms of this Contract."  Def.'s App. 26. That provision was renewed in the 2004 HAP Renewal Contract.  *See* Def.'s App. 37.  The 2000 Use Agreement similarly stated that the owner "shall not without the written approval of the Secretary [of HUD], demolish, convey, or otherwise subtract from any part of the Residential Area."  Def.'s App. 16. It is thus immaterial whether defendant exercised the right to veto the sale to Summit, and it is equally immaterial, for purposes of a takings claim, whether it did so properly.  Plaintiff voluntarily gave HUD the right to do so.  Any assertion that HUD improperly withheld that approval would have to be enforced either via a contract action or in an APA proceeding.  It cannot give rise to a regulatory taking because the very ability to interfere with plaintiff's right to alienate the property was given to defendant in exchange for the right to prepay its mortgage and the right to participate in the subsidy program.

II.  Plaintiff Was Not In Privity With HUD

Defendant has maintained and we previously held that plaintiff was not in privity with HUD and thus could not sue to enforce the HAP renewal

18

contract in this court.  100 Fed. Cl. at 255.   Because of our own concerns about apparent contrary indications in the contract record, we reopened the question of privity and posed detailed questions regarding the meaning of certain provisions of the renewal contract and statements made by HUD that it was exercising contractual authority in cancelling subsidy payments.  *See* Order of February 14, 2014.  We reach the same conclusion again, however. There was no privity between plaintiff and HUD as to the relevant contract.

Although the terms of the HAP Contract were renewed in 2004, OHFA was substituted as the contract administrator.[16]  In an unpublished decision, the Federal Circuit considered a similar situation–identical renewal provisions– and found that, despite the renewal of the terms of the original assistance payment contract, HUD did not remain a contract administrator and did not remain a party to the contract when a state housing agency signed the renewal contract.  *Senate Manor Props., LLC v. HUD*, No. 2008-1484, 2008 WL 5737006 (Fed. Cir. Aug. 25, 2008) (unpublished).  We reach the same result here.  The fact that HUD remained the ultimate source of funding for the assistance payments does not alter the fact that HUD did not enter into a contract with plaintiff in the 2004 renewal.  *See Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994).  "A grant of benefits and subsequent oversight by HUD is insufficient to establish a contractual obligation between [plaintiff] and the government."  *Id.*  This is so even when the administrator is "'merely a conduit for the federal funds.'"  *Id.* (quoting *Marshall N. Dana Constr., Inc. v. United States*, 229 Ct. Cl. 862, 864 (1982).   As defendant argues  in its supplemental briefing, paragraph 4(a)(2), which states that HUD remains a party to the renewal contract in the event of an assignment by HUD to a public housing authority, only applies when HUD, not a state housing authority, is the contract administrator and, subsequent to that renewal, assigns the contract to a state housing authority.  The Federal Circuit accepted this argument in

---

[16] By statute "[t]he Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units"   42 U.S.C. § 1437f(b)(1) (2006).  If "no public housing agency has been organized or where the . . . a public housing agency is unable to implement the provisions of this section, the Secretary is authorized to enter into such contracts and to perform the other functions assigned to a public housing agency by this section."  *Id.*  As defendant points out, there is no comparable authority for HUD to act as the contract administrator when there is a state administrator in place.

*Senate Manor*, 2008 WL 5737006, at *3.  In other words, language appearing to retain HUD as a party to the HAP renewal has a condition precedent, namely, the absence of a local administrator.

The conclusion is inescapable: HUD and Normandy had no contractual relationship in the 2004 HAP renewal. Plaintiff is unable to enforce its rights in that contract against the federal government because the United States was not a party to it. To the extent that HUD correspondence with plaintiff was to the contrary, these were misstatements that could not resuscitate a contract relationship.  They did not change the fundamental fact that OHFA was the contract administrator after the 2004 renewal.  The confusion stems, in part, from the fact that HUD, like a skin walker from Navajo legends, chooses to appear in some relationships as a contracting party, although it always retains the right to resume its regulatory persona, which is what it did here.

## CONCLUSION

As our predecessor the Court of Claims phrased it, the Takings Clause has "limited application to the relative rights in property of parties litigant which have been voluntarily created by contract." *J.J. Henry Co. v. United States*, 411 F.2d 1246, 1249 (Ct. Cl. 1969).  This is just such a case.  Although plaintiff has standing, defendant has shown that plaintiff cannot prevail on its takings claim.  We also reaffirm that plaintiff has no contract claim against the United States based on the HAP Renewal Contract.  Accordingly, although we deny defendant's motion to dismiss for lack of standing, we grant defendant's motion for summary judgment.   The clerk of court is directed to enter judgment dismissing the complaint.  No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge

20